JOINT APPENDIX 00123

# EXHIBIT 4

LEASE AGREEMENT
(Multi-Tenant)

THIS LEASE AGREEMENT (hereinafter referred to as "this Lease" or "Lease"), dated as of the Date of Lease hereinafter stated, is made and entered into by and between the parties hereinafter named.

WITNESSETH: That in consideration of the mutual covenants herein contained, the payment of rents hereinafter stipulated and the performance of the other obligations hereinafter undertaken, IT IS AGREED by and between the parties as follows:

Article 1        CERTAIN BASIC LEASE PROVISIONS

Each reference in this Lease to any provisions contained in the "Basic Lease Provisions" of this Article 1 shall incorporate all of the terms and figures stated in each of the provisions in this Article 1 which are applicable thereto.

1.1      Parties and Principal Terms.

Date of Lease ...................................................................................January 17, 2012

Landlord:      Carson Madrona Company LLC
               a California limited liability company

Manager:       SanOak Management Company

Address of Landlord:
               C/O SanOak Management Company
               9440 Santa Monica Boulevard, Suite 610
               Beverly Hills, California 90210
               Phone  (310) 786-2100
               Fax    (310) 271-3515

Tenant:        Warehouse and Delivery Solutions, Inc.., a California corporation
               D/b/a – Ashley Furniture

Address of Tenant:
               25125 Madison Ave., Suite 106
               Murrieta, CA 92562
               Phone: (800) 743-6367
               Fax:    (817)856-4632

Ver 1.04 01/17/12                          - 1 -



Hartford_006274

Brokers: (See Article 42)

    Landlord's Broker: ............................................................. Bill Neiman

    Tenant's Broker: ......................................... Craig Hagglund, Lee & Associates

Lease Term (See Article 2):

    <u>Lease Commencement Date</u>: ...........................................................April 1, 2012

    <u>Rent Commencement Date</u>: ..................................................... September 1, 2012

    <u>Ending Date</u>: ............................................................... August 31, 2018

    <u>Renewal Option</u>:                   One Three (3) year renewal option at Tenant's election (See Section 2.3)

    <u>Exercise Date</u>:                   November 30, 2017 (nine (9) months prior to the Ending Date)

Project:

    The Premises are part of Landlord's multi-tenant real property development known as Coliseum Way Industrial Complex, consisting of 6195 Coliseum Way (the "6195 Building") and 6201 Coliseum Way (the "6201 Building"), Oakland, California. The 6195 Building and the 6201 Building are collectively herein referred to as the "Buildings". The Buildings, related land and improvements, and parking lots owned by Landlord on the east side of Coliseum Way, are herein collectively referred to as the "Project".

Premises:

    The leased premises shall consist of Units A, B C and D in the 6195 Building and Lot 2 on the east side of Coliseum Way as identified on Exhibit "A" and "B" to this Lease (the "Premises"). The total building area of the Premises is 88,729 Square Feet.

Tenant's Pro Rata Share of Project:

    For purposes of this Lease, Tenant's Pro Rata Share of the Project shall be that percentage which the total building area of the Premises bears to the aggregate number of square feet of building area of the buildings within the Project which is leased or held for lease by tenants, as of the date on which the computation is

Ver 1.04 01/17/12               - 2 -

*EC*

Hartford_006275

made.  In the event of any changes during the Term of this Lease in the square footage of the Premises or the total square footage of the Project, Tenant's Pro Rata Share set forth below shall be revised accordingly.

As of the date hereof, the aggregate number of square feet of building area of the buildings within the Project which is leased or held for lease by tenants is 356,680 square feet.  Based on this total area, the Tenant's Pro Rata Share of Project shall be 24.88%

Truck Loading and Unloading Area and Parking:

As shown on Exhibit B, Tenant shall have the exclusive use of the following: (i) 7 Existing Docks for 24' box trucks designated as 1 through 7 (the "Existing Docks"); (ii) five (5) new dock positions for 24' box trucks in the main plaza designated as "New Dock 4A" through "New Dock 8A" (the "Five New Docks"); (iii) three (3) new dock positions for any size tractor and trailer designated as New "Dock 1A" through "New Dock 3A" (the "Three New Docks") and; (iv) Lot 2 (as shown on Exhibit A) for automobile and truck parking and the striped parking spaces in front of the Premises as shown on Exhibits A & B and identified as "Customer Pickup Area" and "Ashley Parking."

Tenant may also use its designated docks for truck and/or automobile parking subject to rules and regulations promulgated by the Landlord for the safe and efficient operation of the common truck plaza serving the Coliseum Way complex. The Project is served by a common area truck plaza located between the 6195 Building and the 6201 Building (the "Truck Plaza").  Tenant's use of the Truck Plaza shall be non-exclusive in common with other tenants of the Project. Tenant shall utilize the Truck Plaza in coordination and cooperation with the other tenants of the Project so as to avoid congestion of the Truck Plaza, to avoid blocking by Tenant's trucks of access by other tenants to their docks and premises. The Truck Plaza shall be administered by Landlord for the benefit of all of the tenants of the Project.  Landlord reserves the right to establish such reasonable rules and regulations as in Landlord's judgment may, from time to time, be needed for proper and orderly traffic flow, safety, care and cleanliness of the property and for the preservation of good order therein.  Such rules and regulations shall be effective upon adoption by Landlord and written notification disseminated by Landlord to the tenants in the Project affected thereby.

In order not to obstruct the smooth flow of traffic in the truck plaza area of the Project, all Tenant's trucks and trailers within the truck plaza area shall be properly docked at Tenant's truck dock at all times during loading and unloading. The seven Existing Docks and the Five New Docks shall only be used for Tenant's 24 foot box trucks, vans, automobiles and any other vehicle measuring

Ver 1.04 01/17/12                           - 3 -

Hartford_006276

less than or equal to thirty-five (35) feet in total overall length. Any vehicle having an overall length of more than thirty-five (35) feet shall be parked only at one of the Three New Docks (1A, 2A or 3A).

In addition to Lot 2, Tenant shall also have the right to park its passenger automobiles in the areas identified on Exhibits A & B as "Ashley Parking", "Customer Pickup Area" and/or at Tenant's docks as described above, further provided that no Tenant vehicles shall at any time be parked in any part of the Truck Plaza other than in the "Ashley Parking", "Customer Pickup Area" and Tenant's docks, or in such a way as to block or otherwise disrupt the smooth flow of vehicle traffic into or out of the Truck Plaza area from/to Coliseum Way. Notwithstanding the foregoing, Tenant's Parking shall at all times be subject to, and Tenant shall cause its employees and customers to comply with, rules and regulations which may be established and/or revised from time to time by Landlord for reasonable regulation of the vehicular traffic in Truck Plaza.

Location of 6195 Building:

6195 Coliseum Way
Oakland, California 94621

Tenant's Permitted Uses of the Premises:

Tenant shall only use the Premises for the warehousing, distribution, clearance center (retail sales to the general public), and related administrative and office use in connection with Tenant's furniture business, and for other related purposes. Tenant shall not store any of its property in the Truck Plaza or at any other location outside the Premises, except while loading or unloading trucks, trailers or containers. Tenant's use of the Premises and the Truck Plaza shall at all time be in full compliance with the provisions of Article 4 of this Lease and in compliance with all applicable laws, ordinances, rules and regulations.

Exhibits (See Article 41):

| | |
|---|---|
| Exhibit A: | Plan of the Premises (hatched) including Lot 2 |
| Exhibit B: | Detail Plan showing Tenant's Docks |
| Exhibit C: | Site Plan showing the location of the Premises within the Project |
| Exhibit D: | Landlord's Work |

Ver 1.04 01/17/12                                     - 4 -

*EC*

Hartford_006277

1.2    <u>Summary of Charges</u>.  Each reference in this Lease to any charge referred to in this Section 1.2 shall be deemed to incorporate all of the terms and figures stated in the following provisions which are applicable thereto:

Security Deposit (Payable on signing of Lease):......................................$54,000.00

Basic Rent:

| Period | Rate per Sq. Ft. of Building | Monthly Basic Rent |
|---|---|---|
| April 1, 2012 – August 31, 2012 | $0.00 psf | $      0.00 |
| September 1, 2012 – August 31, 2013 | $0.40 psf | $35,492.00 |
| September 1, 2013 – August 31, 2014 | $0.41 psf | $36,379.00 |
| September 1, 2014 – August 31, 2015 | $0.42 psf | $37,266.00 |
| September 1, 2015 – August 31, 2016 | $0.43 psf | $38,153.00 |
| September 1, 2016 – August 31, 2017 | $0.44 psf | $39,041.00 |
| September 1, 2017 – August 31, 2018 | $0.45 psf | $39,928.00 |

Additional Rent:

Commencing on the Rent Commencement Date, as Additional Rent and in addition to the Basic Rent, Tenant shall pay its pro-rata share of the Project's operating expenses and taxes, as more fully defined in Article 5 (Taxes), Article 6 (Maintenance), Article 13 (Utilities) and Article 20 (Insurance).  The preliminary estimate of these charges for the twelve (12) month period commencing January 1, 2012, is $0.13 per square foot per month of the Premises.  Such estimate is approximate and is subject to revision, annual reconciliation and adjustment as hereinafter provided.  Commencing on the Rent Commencement Date, Tenant's estimated Additional Rent payments shall be $11,535.00 per month.

Article 2    PREMISES AND TERM

2.1    <u>Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the premises described in Section 1.1 and identified on Exhibits "A", "B" and "C" attached hereto and incorporated herein by reference, for the Term and upon the conditions and agreements set forth in this Lease.  Said premises are hereinafter collectively referred to as the "Premises" and said building containing the Premises is hereinafter individually called the "Building.".

2.2    <u>Initial Term</u>.  The "Initial Term" of this Lease shall begin on the date (the "Lease Commencement Date") specified as the Lease Commencement Date in Section 1.1.  Tenant's obligation to pay Basic Rent (as defined in Section 3.1) and Additional Rent (as defined in

Ver 1.04 01/17/12                          - 5 -



Hartford_006278

Section 3.2) with respect to the Premises shall commence on the date (the "Rent Commencement Date") specified as the Rent Commencement Date in Section 1.1. The Initial Term of this Lease shall end (the "Ending Date") at 11:59 P.M. local time at the Premises on the Ending Date set forth in Section 1.1, unless extended pursuant to other express provisions of this Lease. "Term" as used in this Lease shall mean the Initial Term, plus, in the event the Renewal Option defined in Section 2.3 is exercised by Tenant, the three (3) year Option Term.

2.3    Renewal Option. Provided that (i) there has theretofore been no Event of Default under this Lease which has remained uncured beyond the applicable cure period, and (ii) no Event of Default is then continuing hereunder, Tenant shall have the option (the "Renewal Option") to extend the Term of this Lease for one (1) period of three (3) years (the "Option Term"). This Renewal Option may be exercised by giving written notice (the "Option Notice") to Landlord on or before the Exercise Date set forth in Section 1.1 hereof time being of the essence. If Tenant fails to timely exercise this Renewal Option, this Lease shall terminate on the original Ending Date, Tenant shall be deemed to have waived its right to exercise the Renewal Option set forth in this Section 2.3, and said Renewal Option shall be null and void and of no further force or effect. If the Renewal Option is timely exercised, Basic Rent payable during the Option Term shall be as follows:

| Period | Rate per Sq. Ft. of Building | Monthly Basic Rent |
|---|---|---|
| September.1, 2018 – August 31, 2019 | $0.46 psf | $40,815.00 |
| September.1, 2019 – August 31, 2020 | $0.47 psf | $41,703.00 |
| September.1, 2020 – August 31, 2021 | $0.48 psf | $42,590.00 |

2.4    Delivery of Possession. From and after Landlord's delivery of the Premises on the Lease Commencement Date, Tenant shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Basic and Additional Rent. As soon as practicable following the Lease Commencement Date, Tenant shall make arrangements with PG&E to transfer the electrical and gas service (if gas is to be used by Tenant) to the Premises into Tenant's name, and Tenant shall be responsible to pay to the PG&E all billings for electrical power and gas supplied to and/or used at the Premises from and after the Lease Commencement Date.

2.5    Delay of Possession. As provided in Section 7.1 and Exhibit D of this Lease, Landlord shall perform certain work within and outside the Premises. Provided this Lease is fully executed at least 40 days prior to the Lease Commencement Date, Landlord anticipates that Landlord will be able to complete the interior improvements described in Section 7.1 and Exhibit D of this Lease prior to the Lease Commencement Date. Landlord anticipates needing up to 90 days after full execution of this Lease to complete the exterior improvements (the construction of the new docks) and as such, it may be necessary that some of Landlord's Work be done after delivery of Possession of the Premises/Lease Commencement Date. In such case, Tenant



Hartford_006279

understands and agrees that Landlord may perform its work at the Premises after such delivery of possession to Tenant/Lease Commencement Date, and Landlord agrees that Landlord shall proceed diligently to complete its work as soon as reasonably practicable, and shall coordinate such work with Tenant. Landlord's Work being performed under circumstances described in the preceding sentence shall not be deemed a delay in delivery of possession of the Premises to Tenant. However, in the event Landlord has not substantially completed Landlord's Work and made the Three New Docks and Five New Docks available for Tenant's use within 90 days after full execution of this Lease (the "90 Day Period"), Landlord shall credit Tenant with one free day of Rent (both Basic and Additional Rent) for each day by which substantial completion of Landlord's Work is delayed beyond the end of the 90 Day Period. By way of example, if this Lease is fully executed on January 20, 2012, the 90 Day Period would expire on April 19, 2012, which is 90 days after full Lease execution. If under this example, if Landlord's Work is not substantially completed and available for Tenant's use until April 29, 2012 (a delay of 10 days) , then Tenant would receive a rent credit equal to ten days of Basic Rent and Additional Rent.

2.6  <u>Landlord's Use of a Portion of the Premises.</u>  To accommodate the Landlord maintaining a management office at the Project, Tenant is allowing the Landlord to keep a 223 square foot office in Unit A of the Premises designated as "SanOak Office" on Exhibits A, B and C. Landlord will, at Landlord's sole cost and expense, cover up the window in the north wall of the SanOak office, close off the door in the west wall and install a new door in the SanOak Office to provide direct access to the SanOak office from the Truck Plaza. Tenant shall have the right to take back the SanOak office at any time during the Lease Term by providing Landlord with 60 days prior written notice. In return for the use of the SanOak Office, Landlord will provide Tenant with a monthly rent credit (which is all inclusive of rent and utilities) as follows:

| | |
|---|---|
| April 1, 2012 – August 31, 2013 | $ 300.00 |
| September 1, 2013 – August 31, 2014 | $ 310.00 |
| September 1, 2014 – August 31, 2015 | $ 320.00 |
| September 1, 2015 – August 31, 2016 | $ 330.00 |
| September 1, 2016 – August 31, 2017 | $ 340.00 |
| September 1, 2017 – August 31, 2018 | $ 350.00 |
| September 1, 2018 – August 31, 2019 | $ 360.00 |
| September 1, 2019 – August 31, 2020 | $ 370.00 |
| September 1, 2020 – August 31, 2021 | $ 380.00 |

Article 3    RENT AND SECURITY DEPOSIT

3.1  <u>Basic Rent.</u>  Tenant shall pay to Landlord at its address set forth in Section 1.1 as rent, the Basic Rent as set forth in Section 1.2 of this Lease, payable monthly in advance on or before the first business day of each calendar month during the Term of this Lease commencing on the Rent Commencement Date (if such date falls on the first day of a calendar month). In the event the Rent Commencement Date falls other than on the first day of a calendar month, then Basic Rent and Additional Rent shall be prorated daily for the partial month beginning on the Rent Commencement Date and ending on the last day of the month in which the Rent Commencement Date falls, and shall be payable on the Rent Commencement Date (or the first

Ver 1.04 01/17/12                                    - 7 -

Hartford_006280

business day thereafter if such date falls on a weekend or Federal holiday). If the Lease Ending Date falls other than on the last day of a calendar month, then rent payable with respect to the partial calendar month at the end of the Lease term shall be prorated on a daily basis.

    3.2    <u>Payment</u>. Tenant hereby covenants and agrees to pay without deduction or set off (and without an invoice from Landlord) the rent hereby reserved as and when due, and also all sums of money, charges or other amounts required to be paid by the Tenant to the Landlord or to another person under this Lease to the address as set-forth in Section 1.1 above, which sums shall also be considered to be "Additional Rent" in addition to the Basic Rent provided for in Sections 3.1 and 1.2. Nonpayment of such Additional Rent when due shall constitute a default under this Lease to the same extent, and shall entitle the Landlord to the same remedies, as nonpayment of Basic Rent. If such payment is returned for non sufficient funds ("NSF") tenant shall pay Landlord $25 as a handling fee.

    3.3    <u>Security Deposit</u>. Upon the execution of this Lease, Tenant shall deposit with Landlord a cash Security Deposit in the amount set forth in Section 1.2 above. Landlord may apply all or part of the Security Deposit to any unpaid rent or other charges due from Tenant or to cure any other defaults of Tenant. If Landlord uses any part of the Security Deposit, Tenant shall restore the Security Deposit to its full amount within ten (10) days after Landlord's written request. Tenant's failure to do so shall be a material default under this Lease. No interest shall be paid on the Security Deposit (except as specifically hereinafter provided), and Landlord shall not be required to keep the Security Deposit separate from Landlord's other accounts. Tenant is prohibited from applying the security deposit toward any rental payment.

## Article 4    USE OF PREMISES

    4.1    <u>Permitted Uses</u>. Tenant may use and occupy the Premises for only the uses set forth in Section 1.1 above. Any proposed change in such use must be submitted to Landlord in writing and approved (such approval shall be in Landlord's sole judgment) in writing by Landlord. Tenant shall at all times comply with all zoning, environmental and other applicable laws, ordinances, rules and regulations, and Tenant shall not use or occupy the Premises for any purpose which would (i) constitute a nuisance to occupants of the Project or neighboring buildings, (ii) expose Landlord to increased liability, (iii) cause waste or damage to the Project or any part thereof, (iv) endanger the safety of others in the Project, (v) cause environmental contamination to any part of the Project or the environment, or (vi) increase the premiums on any insurance policy or policies maintained by Landlord with respect to the Building or the Project. Tenant shall not store materials outside the Premises. Tenant shall dispose of all refuse in containers designed therefor and provided by Tenant and Tenant shall be responsible for any pest infestation caused by Tenant's product and/or refuse. Tenant shall not do or permit to be done anything which will invalidate or increase the cost of any insurance policy covering the Project, property located therein or property or improvements adjacent thereto. Tenant shall fully comply with all rules, orders, regulations and requirements of any insurance rating bureau or other organization performing a similar function. Tenant shall not conduct or permit any auctions or sheriff's sales in or about the Premises. Tenant shall comply with reasonable rules and



Hartford_006281

regulations regarding the use of the Premises and the common areas of the Project as may be promulgated by Landlord from time to time.

4.2    <u>Hazardous Materials</u>.    As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, material or waste or related materials including, without limitation, any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" now or subsequently regulated under any applicable federal, state or local laws or regulations, including without limitation petroleum-based products, paints, solvents, lead, cyanide, printing inks classified as hazardous by the U.S. Environmental Protection Agency ("EPA") or any other official authority, acids, DDT, methyl bromide or other pesticides, ammonia compounds and other chemical products, asbestos, PCBs and similar compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.    Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Project and related grounds by Tenant, its agents, employees, contractors, sublessees or invitees without the express prior written consent of Landlord, which may be withheld in Landlord's sole discretion. Tenant has advised Landlord that Tenant will be using and storing small quantities of aerosol paint spray cans, lacquer spray cans and solvent ("Allowed HazMat"). While the Allowed HazMat is in the Premises but not in active use, Tenant will at all times store the Allowed HazMat in a fire retardant cabinet pursuant to the requirements and specifications of the Occupational Safety & Health Administration, EPA, National Fire Protection Association, the Oakland Fire Department and any other official authority (individually and collectively referred to as the "HazMat Regulatory Agencies"). Landlord hereby agrees to allow Tenant to use and store the Allowed HazMat in reasonable quantities within the Premises, provided that the Allowed HazMat is used and stored pursuant to the requirements and regulations as set forth by the HazMat Regulatory Agencies. Tenant hereby indemnifies and holds harmless Landlord from and against any and all claims, losses, liabilities, penalties or other costs incurred by reason of a breach of this Section 4.2 and/or any applicable laws, ordinances or regulations applicable to HazMat.

Article 5    REAL ESTATE TAXES AND RENT TAX

5.1    <u>Reimbursement by Tenant</u>.    Tenant shall pay to Landlord as Additional Rent at the time and in the manner hereinafter provided, Tenant's Pro Rata Share of the Real Estate Tax Expenses (hereinafter also referred to as "Real Estate Taxes" or simply "Taxes") except as noted in Section 5.8 below.

5.2    <u>Real Estate Tax Expenses</u>.    The term "Real Estate Tax Expenses" shall include the sum of (a) and (b) below in this Section 5.2:

(a)    Those taxes levied upon the Project, including the land upon which the Project and surrounding grounds, parking and driveway areas are situated and all improvements located thereon situated within the Premises, if the Project is assessed separately, and shall mean,

Ver 1.04 01/17/12                                - 9 -



Hartford_006282

if the Project is not separately assessed, those taxes attributable to the Project, including the land upon which the Project and surrounding grounds, parking and driveway areas are situated and all improvements located thereon situated within the Premises, which shall be deemed to be equal to the product obtained by multiplying the Real Estate Taxes levied on the tax lot of which the Project is a part by a fraction, the numerator of which shall be the rentable area of the Project and the denominator of which shall be the rentable area of all buildings located on the tax lot of which the Project is a part, as calculated by Landlord.

        (b)    (i) Any form of assessment, fee, levy, charge, penalty, or tax imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part; and (ii) any assessment, tax, fee, levy or charge in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of Real Estate Tax Expenses. "Real Estate Tax Expenses" shall not, however, include Landlord's federal, state or local income, franchise, inheritance, gift or estate taxes, or any interest or penalties imposed by taxing authorities. With respect to assessments for which the taxpayer may elect the term of repayment, for the purposes of this Article 5, Landlord shall elect (or be deemed to have done so) the longest available payment term for such assessments.

    5.3    <u>Rent Taxes</u>  Tenant shall reimburse Landlord for any and all taxes on Landlord's right to rent or obtain income from the Premises or as against Landlord's business of leasing the Premises, any tax or charge in substitution, partially or totally, of any of the aforesaid ("Rent Taxes").  Rent Taxes shall not, however, include Landlord's federal, state or local income, franchise, inheritance, gift or estate taxes.

    5.4    <u>Non-Calendar Year</u>.  For the purpose of determining the applicability of Real Estate Taxes and Rent Taxes (collectively referred to herein as "Taxes") for any calendar year, Taxes which are levied on the basis of a tax year which does not coincide with a calendar year shall be deemed to apply one twelfth (1/12th) to each calendar month in such tax year.

    5.5    <u>Payment of Estimated Taxes</u>.  Tenant shall pay to Landlord as Additional Rent each month, together with Tenant's payment of Basic Rent, one twelfth of the Taxes estimated by Landlord to be due from Tenant under this Article 5 for the year in which such month falls. Landlord's estimate shall be based on the then current tax rates.  Within 30 days following the rendering by Landlord of the statement described in Section 5.6 below, Tenant shall pay to Landlord any amount shown in such statement by which Tenant's estimated tax payments for the period covered by the statement were less than the actual Taxes Applicable to the Premises during such period.  If Landlord's statement sets forth a revised Estimated Monthly Tax figure based upon actual Taxes Applicable to the Premises, then such revised figure shall be thereafter used by Tenant in payment of Monthly Estimated Taxes until such figure is further revised by Landlord on a subsequent statement.



Hartford_006283

D:\PrintImageBundler\Temp\802042\Originals\LEASE AGREEMENT.PDF

5.6     Reconciliation.   Each year Landlord shall furnish the Tenant with a written statement showing the computation of Taxes Applicable to the Premises under this Article 5.  To the extent the total of Tenant's payments of Estimated Taxes for the period covered by Landlord's statement is different from the actual amount shown on Landlord's statement, Tenant shall pay any deficit pursuant to Section 5.5, or shall be credited with any overpayment against future estimated tax payments.  If the Term of this Lease expires prior to the determination and payment by Tenant of Additional Rent with respect to Taxes, Tenant's obligation to pay any Additional Rent with respect to Taxes due under this Article 5 for any portion of the Term of this Lease for which the same has not been paid or has been underpaid by Tenant shall survive the termination of this Lease even though determination of such Additional Rent cannot be made until after such termination.  To the extent Taxes are attributable in part to a period falling before the Term of this Lease begins or after the Term ends, the same shall be pro-rated on a daily basis to the Term of this Lease.

5.7     Tax contest.   In the event that Landlord contests the Taxes, Landlord shall be entitled to reimbursement from Tenant of Landlord's reasonable costs and expenses, but in no event shall Tenant be required to reimburse Landlord in an amount greater than Tenant's Pro Rata Share of any savings that are realized. The net savings and/or refunds received by Landlord from a successful tax appeal (after Landlord's reimbursement as described above), if any, shall be passed back to Tenant to the extent the Tenant shared in the payment of the applicable taxes, based on Tenant's Pro Rata Share.

5.8     Increase in Assessment Due to Sale of Project.   In the event that Landlord sells the Project within the first 36 months of the Lease Term that results in an increase in the Project's real estate tax assessment (the "Tax Assessment") above 2% of the Tax Assessment in effect immediately prior to the sale of the Project and there is an increase in the Real Estate Tax Expense of the Project, Tenant's pro-rata share of the Real Estate Tax Expense shall be computed as follows. For the first year following the sale, the total Real Estate Tax rate on all items discussed in Sections 5.2 (a) and (b) above shall be multiplied by the Tax Assessment of the Project immediately prior to the sale of the Project increased by 2% (the amount allowed under California Proposition 13). For each year thereafter through the remaining Lease Term, the Assessed Value shall continue to increase by 2% per year, but in no event shall the Assessed Value increase in excess of the then current Assessed Value of the Project. If a sale were to occur after the first 36 months of the Lease Term, this Section 5.8 shall not apply and will be of no force and effect.

## Article 6     REPAIRS AND MAINTENANCE

6.1     Repairs by Landlord.   Landlord shall perform or cause to be performed the following repairs throughout the Term of this Lease, all required repairs of the structural components of the Premises including, but not limited to, the exterior walls (excluding windows, doors, glass and wall surfaces and finishes), foundations and roof (including gutters and downspouts) and the common areas of the Project. Nothing herein contained shall be deemed to require Landlord to repair or restore any damage caused directly or indirectly by Tenant, its

Ver 1.04 01/17/12                          - 11 -

Hartford_006284

employees, contractors, licensees or invitees, all of which shall be Tenant's sole responsibility. Landlord's liability under this Article 6 shall be limited to the correction of any deficiencies for which Landlord is responsible under this Section 6.1. Landlord shall not be liable to Tenant for any consequential damages or inconvenience, nor shall Tenant be entitled to any abatement or reduction of rent by reason of any repairs made or required to be made by Landlord hereunder.

6.2  **Maintenance by Tenant.** Except for those items expressly required to be maintained by Landlord under Section 6.1, Tenant shall maintain all parts of the Premises in good repair and condition (including all necessary replacements), including but not limited to, painted finishes, interiors, heating ventilating and air conditioning systems and equipment ("HVAC") to the extent located within the Premises, electrical systems to the extent located within the Premises and lighting, plumbing to the extent located within the Premises, fire sprinklers, floors and floor finishes and doors. Tenant shall promptly repair or replace at Tenant's sole cost and expense any damage or injury to all or any part of the Project and adjacent grounds caused by Tenant or its agents, employees, contractors, licensees or invitees. In the event Tenant fails to maintain the premises or make repairs as required by this Section 6.2 promptly and such failure continues for fifteen (15) business days after written notice to Tenant, Landlord may (but shall not be required to) cause the same to be done, in which event Tenant shall promptly reimburse the cost thereof to Landlord on demand. If the required maintenance affects more than Tenant's Premises, Tenant shall pay only its Pro Rata Share thereof. Provided Tenant properly maintains the HVAC serving only the Premises, which maintenance shall include, but shall not be limited to, changing the filters on at least a semi-annual basis, Landlord will warranty the performance and pay for necessary repairs of the HVAC in the Premises for the first year of the Lease term. Landlord highly recommends that Tenant retain an experienced and qualified HVAC maintenance company to inspect and maintain the HVAC equipment at intervals no less frequent than annually, to avoid costly repairs or replacements resulting from Tenant's failure to properly maintain such equipment.

6.3  Reimbursable Expenses.  Except as specifically set forth in this section, Tenant shall pay to Landlord as Additional Rent at the time and in the manner hereinafter provided, Tenant's Pro Rata Share of all costs of Landlord's operation, maintenance and repairs of the Project ("Reimbursable Expenses") including, but not limited to, the following: gardening and landscaping; common area electricity, water and sewage charges; maintenance of signs for the Project and not for specific Tenants; premiums (or a sum equivalent to such premiums if Landlord is self-insuring) for liability insurance on the project and worker's compensation insurance; all personal property taxes levied on or attributable to personal property used in connection with the Project; straight-line depreciation on personal property owned by Landlord which is consumed in the operation or maintenance of the Project; rental or lease payments paid by Landlord for rented or leased personal property used in the operation or maintenance of the Project; administrative, accounting and other necessary and reasonable management overhead costs allocated to the Project; wages, salaries, and other compensation and benefits of all non-executive persons engaged in the operation, maintenance, or security of the Project plus employer's Social Security taxes, unemployment taxes, insurance, and any other taxes imposed on Landlord that may be levied on those wages, salaries, and other compensation and benefits for non-executive employees (If any of Landlord's employees provide services for properties other

than the Project, only the prorated portion of those employees' wages, salaries, other compensation and benefits, and taxes reflecting the estimated percentage of their working time devoted to the Project shall be included); fees for required licenses and permits; repairing, resurfacing, repaving, maintaining, painting, lighting, cleaning, security, refuse removal; and reserves for exterior painting. Reimbursable Expenses which are capital expenses shall be amortized and only such amount, amortized at Landlord's actual borrowing interest rate for such capital expenses, over a period of time reasonably determined by Landlord to be the estimated useful life of the item, shall be charged each year as a Reimbursable Expense. Landlord may cause any or all services to be provided by third parties on commercially reasonable terms competitive in the Oakland, California market, and the cost of such services shall be included in Reimbursable Expenses. Reimbursable Expenses shall not, however, include (a) ground lease rents, (b) debt service, (c) depreciation of real property; (d) costs or expenses incurred by Landlord in connection with advertising, marketing or leasing activities or in connection with Landlord's construction of improvements for a tenant's space, (e) the costs of providing any services to a tenant which are reimbursed to Landlord by such tenant or which are not also available to Tenant, (f) attorneys' fees and expenses incurred in connection with lease negotiations or lease disputes with current or prospective Project tenants or in actions or proceedings to enforce lease obligations of Project tenants, (g) attorneys' fees and expenses, judgments, settlements or arbitration awards arising from Landlord's personnel's tort liability, (h) costs of correcting any work defects, (i) costs arising from acts or omissions of other tenants, (j) costs of repairs, restoration or replacements occasioned by fire or other casualty or caused by the exercise of eminent domain rights, whether or not insurance proceeds or condemnation awards are recovered or adequate or (k) expenses paid from reserves included as Reimbursable Expenses.

6.4    Payment of Estimates.    Tenant shall pay to Landlord as Additional Rent each month, together with Tenant's payment of Basic Rent, one twelfth of Tenant's Pro Rata Share of the Reimbursable Expenses for the Project, as estimated by Landlord under this Article 6 for the year in which such month falls. Within 15 days following the rendering by Landlord of the statement described in Section 6.5 below, Tenant shall pay to Landlord any amount shown in such statement by which Tenant's estimated payments for the period covered by the statement were less than the actual Reimbursable Expenses during such period. If Landlord's statement sets forth a revised estimated monthly Reimbursable Expenses figure, then such revised figure shall be thereafter used by Tenant in payment of monthly estimated Reimbursable Expenses until such figure is further revised by Landlord on a subsequent statement.

6.5    Reconciliation.    Each year Landlord shall furnish the Tenant with a written statement showing the computation of Reimbursable Expenses under this Article 6. To the extent the total of Tenant's payments of Reimbursable Expenses for the period covered by Landlord's statement is different from the actual amount shown on Landlord's statement, Tenant shall pay any deficit pursuant to Section 6.4 or shall be credited with any overpayment against future estimated tax payments. If the Term of this Lease expires prior to the determination and payment by Tenant of Additional Rent with respect to Reimbursable Expenses , Tenant's obligation to pay any Additional Rent with respect to Reimbursable Expenses due under this Article 6 for any portion of the Term of this Lease for which the same has not been paid or has

Ver 1.04 01/17/12                                       - 13 -



Hartford_006286

been underpaid by Tenant shall survive the termination of this Lease even though determination of such Additional Rent cannot be made until after such termination. To the extent Reimbursable Expenses are attributable in part to a period falling before the Term of this Lease begins or after the Term ends, the same shall be pro-rated on a daily basis to the Term of this Lease.

6.6    Audit. Tenant shall have the right to audit Landlord's accounting of Reimbursable Expenses provided that Tenant provides written notice of Tenant's intention to audit within 30 days after receipt of Landlord's annual written statement showing the computation of Reimbursable Expenses. If Tenant elects to audit Landlord's accounting, Tenant and Landlord shall mutually agree on the timing of the audit so as not to interfere with Landlord's or tenant's on-going business. Landlord shall provide Tenant and its auditors with reasonable access to Landlord's books and records for such purpose at Landlord's office handling the record keeping. If Tenant shall not have availed itself of such inspection, Tenant agrees to accept as final and determinative the amount shown as due on such statement, and Tenant agrees to pay the same.

Article 7    LANDLORD'S AND TENANT'S WORK

7.1    Landlord's Work. Landlord shall be responsible to provide the Premises to Tenant with all existing mechanical, electrical and plumbing systems in good working order and in broom clean condition on the Lease Commencement Date. Landlord shall perform certain construction work in and adjacent to the Premises as further described in Exhibit D.

7.2    Condition of Premises. With the exception of Landlord's Work to be performed as provided in Section 7.1 and Exhibit D, Tenant has inspected the Premises and expressly agrees that the Premises are being leased in "as-is" condition.

7.3    Tenant's Work. Any work within the Premises which may be desired by Tenant shall be constructed at the sole cost and expense of Tenant and in compliance with Article 10 and Article 11 of this Lease.

Article 8    INTENTIONALLY OMITTED

Article 9    HOLDING OVER

If Tenant holds over without the written consent of Landlord after the expiration of the Term hereof, Tenant's holdover shall be a tenancy at sufferance at a Basic Rent equal to 150% of the Basic Rent applicable immediately prior to the expiration date hereof with all provisions of this Lease (other than the Term and Basic Rent) remaining in full force and effect.

Ver 1.04 01/17/12                              - 14 -

$\mathcal{EC}$

Hartford_006287

D:\PrintImageBundler\Temp\802042\Originals\LEASE AGREEMENT.PDF

## Article 10    ALTERATIONS

    10.1    <u>Consent of Landlord</u>.  Tenant may, at Tenant's own expense (and with the prior written approval of Landlord, which approval will not be unreasonably withheld), make such improvements to the Premises as Tenant deems necessary for its use, provided, however, that no alterations or improvements shall be made which would (i) alter or affect the structural components of the Building or the exterior of the Building, (ii) reduce the value of the Building, (iii) violate any applicable law, rule, regulation or deed restriction, or (iv) increase the susceptibility of the Building or any of its components to risk of loss by fire or other casualty. All additions and improvements shall be installed in a good workmanlike manner and only new Project-grade materials shall be used and, at Landlord's option stated in writing at the time that Landlord gives its approval of the alterations or improvements, shall be removed and the Premises restored at Tenant's sole cost and expense at the termination of this Lease.  As of the termination of this Lease, Tenant shall also repair any damage caused by the removal of any machinery, equipment, racks or other personal property or trade fixtures, including but not limited to holes in the walls, ceiling and floor.  Tenant shall submit plans and specifications ("Tenant's Plans") in reasonable detail to Landlord for approval prior to constructing any improvements and Landlord shall have a period of fifteen (15) days following receipt thereof within which to review and approve (or reject for reasonably specific stated reasons) Tenant's Plans.  Failure of Landlord to object in writing within said 15 day period, setting forth the reasons for such objections in reasonable detail, shall be deemed approval but shall not be deemed a waiver of requirements (i) through (iv) above in this Section 10.1.  Alterations or improvements to the Premises interior costing $25,000 or less and not requiring governmental permits will not require Landlord's prior approval.

## Article 11    MECHANICS' LIENS

    If Tenant performs or causes to be performed any construction or other work on or about the Premises for which a lien could be filed against the Premises or the Project, Tenant shall provide Landlord with security reasonably acceptable to Landlord that such work will be paid for, and Tenant shall also obtain and deliver to Landlord no less frequently than monthly, and upon completion of the work, written unconditional Lien Waivers of mechanic's liens upon the Premises or Landlord's real property of which the Premises are a part from the contractor(s) who perform such work and the materialmen supplying materials in connection therewith, with respect to that portion of the work theretofore performed.  Notwithstanding the foregoing, if any mechanics' or other lien shall be filed against the Premises or Landlord's property purporting to be for labor or material furnished or to be furnished, or materials specially fabricated, at the request of Tenant, then Tenant shall at its expense cause such lien to be discharged of record by payment, bond or otherwise, within thirty (30) days after the filing thereof.  If Tenant shall fail to cause such lien to be discharged of record within such thirty day period, Landlord may cause such lien to be discharged by payment, bond or otherwise, without investigation as to the validity thereof or as to any offsets or defenses thereto, and Tenant shall, upon demand, reimburse Landlord for all amounts paid and costs incurred, including attorneys' fees, in having such lien discharged of record.

Ver 1.04 01/17/12                                  - 15 -

Hartford_006288

Article 12     CONDITION OF PREMISES

Tenant acknowledges and agrees that, except to the extent expressly set forth in this Lease and the Exhibits and Riders hereto, there have been no representations or warranties made by or on behalf of Landlord with respect to the Premises or the Project or with respect to the suitability of either for the conduct of Tenant's business.

Article 13     UTILITIES

13.1    Payment.  Tenant shall promptly pay any and all charges imposed by utility companies supplying service to the Premises, including but not limited to telephone, electricity, gas, sewer, and water services, and including connection charges, if any; provided, however, that if any utilities supplied to the Premises are supplied through a common meter or other means such that the billing of charges by the respective utility includes charges for services provided to any property not a part of the Premises such charges shall be pro-rated, as reasonably determined by Landlord, among Tenant's Premises and such other property and Tenant shall pay that portion of such charges so attributable to the Premises. Tenant shall pay monthly estimates of such charges to Landlord.

Article 14     ASSIGNMENT AND SUBLETTING

14.1    Landlord's Consent.  Tenant shall have the right to assign the Lease or sublet the Premises (or any  portion of the Premises), provided that no assignment or sublease shall be made by Tenant, and any attempted assignment or sublease shall be void, unless Tenant shall first have complied with the following: (i) Tenant shall not be in default under the provisions of the Lease; (ii) Tenant shall first have obtained the written consent of Landlord to such assignment or sublease, which consent shall not be unreasonably withheld or delayed, and (iii) Tenant shall fully comply with the provisions of this Article 14.  Landlord will not unreasonably withhold or delay consent to a proposed change in use in connection with a proposed assignment or sublease, provided the proposed new use is consistent with quality of the Project, will not increase Landlord's insurance expenses, will not interfere with the use of other tenants in the Project.  If any portion less than all of the Premises is proposed to be subleased by Tenant, such portion must be self-contained and comply with all applicable laws and regulations for legal occupancy, including (without limitation) exits, access by disabled persons, restrooms and other required features, and Tenant must reasonably allocate sufficient parking spaces and loading areas from among those provided to Tenant under this Lease to the subtenant of such portion sufficient to fully accommodate the requirements of such subtenant's operations.

14.2    Profit.  Landlord shall be entitled to receive from Tenant fifty percent (50%) of the Profits (as defined below) actually received by Tenant pursuant to a sublease or assignment. The following shall constitute the definition of "Profits":  the total revenue received from the assignee or sublessee during the sublease term or during the assignment, less (i) the total rent

Ver 1.04 01/17/12                          - 16 -



Hartford_006289

paid by Tenant during the period of the sublease term or during the assignment; (ii) any improvement allowance or other economic concession (i.e. rental abatement, etc.), paid by Tenant to sublessee or assignee and (iii) brokerage commissions.

14.3    Related Entities.  The provisions of Section 14.2 shall not apply to a sublease of all or any portion of the Premises to a Related Entity.  For the purposes of this Section 14.2, a Related Entity is any entity which acquires all or a majority interest in Tenant or acquires all or substantially all of Tenant's assets, or which is acquired in whole or in majority by Tenant, or which is controlled directly or indirectly by Tenant, or which entity controls, directly or indirectly, Tenant or which owns or is owned by the Related Entity, so long as such transaction was not entered into as a subterfuge to avoid the obligations and restrictions of the Lease.

14.4    Joint and Several Obligations.  In the event Tenant enters into an assignment or sublease, Tenant shall remain liable for the performance of this Lease and the obligations of Tenant under this Lease shall be the joint and several obligations of Tenant and the assignee or sublessee, as applicable.  However, in the event that through one or more subleases or assignment to an unrelated party or parties, all (or substantially all) of the rights of Tenant under its Lease are proposed by Tenant to be transferred for all (or substantially all) of the remaining balance of the Lease Term, Landlord shall have the option to terminate the Lease Term early, effective upon the proposed effective date of the transfer of rights.

Article 15    ACCESS TO PREMISES

Landlord, the holder of any fee or leasehold title superior to the Landlord, and the holder of any present or future mortgage affecting the Project, and the authorized representatives of any of them, shall have the right to enter the Premises at all reasonable times on reasonable advance notice for the purpose of examining or inspecting the Premises, showing the Premises to prospective purchasers, lessees, or mortgagees of the Project, and making such alterations, repairs, improvements or additions to the Premises or to the Project as they may deem necessary or desirable, such alterations, repairs, improvements or additions to be consistent with and in no way adversely affecting Tenant's permitted uses of the Premises as set forth herein.

Article 16    SIGNS

16.1    Tenant's Signs.  Tenant shall have the right to install at Tenant's sole cost and expense, and if installed Tenant shall maintain the signage at Tenant's sole cost and expense, at the locations and containing the content described in subsections (a) through (c) below ("Tenant's Signs").

(a)    Premises Entry Door.  Tenant may install identification signage containing the Tenant's company name and logo at the tenant's entry door to the leased Premises similar in size to the other tenant's at the Project.

Ver 1.04 01/17/12    - 17 -

Hartford_006290

(b)    <u>Visible From Coliseum Way</u>.  Tenant may install identification signage on east wall of the 6195 Coliseum Way building (facing Coliseum Way) or in the alternative (if preferred by Tenant), on the south wall (near the east corner) of the 6195 Coliseum Way building.

(c)    <u>Visible From 880 Freeway</u>.  Tenant may install identification signage on west wall of the 6195 Coliseum Way building (facing the 880 Freeway).

The size, content, configuration and location of Tenant's Signs are subject to and governed by the City of Oakland under both the Oakland Planning Code and the Oakland Sign Code.  The signage visible from the 880 Freeway may also be subject to rules and regulations set forth by the California Department of Transportation.  Tenant shall comply with all applicable governmental requirements in connection with the design, installation and maintenance of Tenants Signs.  Tenant's Signs shall also be subject to prior approval by Landlord as to size, design, coloring, materials, means of attachment and exact location (such approval not to be unreasonably withheld).  Tenant shall submit drawings and specifications for such sign in reasonable detail to Landlord for approval.  If Landlord disapproves, the reasons therefor shall be set forth in reasonable detail by Landlord within ten (10) business days from the date upon which Landlord's approval is requested in writing.  If the City of Oakland (or other applicable regulatory body) should declare all or part of Tenant's Signs to not be in compliance with applicable rules and regulations, Tenant shall act quickly to do what is needed to comply therewith, at Tenant's sole cost and expense.  It is Tenant's sole responsibility to interpret and adhere to the applicable signage codes and rules and regulations relating to signage, and Tenant shall indemnify and hold Landlord free and harmless from any liability, fines, penalties and/or other losses, costs or expenses (including reasonable attorney's fees) incurred by Landlord as a result of Tenant's Signs.

16.2    <u>Landlord's Signs</u>.  Landlord may, at any time, install signs and/or banners, including, without limitation, "For Sale" and "For Lease" signs and/or banners in or about the Project provided that such signs do not interfere with Tenant's Signs.

## Article 17    SURRENDER OF PREMISES

At the end of the Term of this Lease, Tenant shall surrender the Premises to Landlord in broom clean condition and in good order and repair except for ordinary wear and tear and damage for which Tenant is not obligated to make repairs under this Lease.  Tenant shall so surrender the Premises without notice of any kind, time being of the essence, and Tenant waives all right to any such notice as may be provided under laws now or hereafter in effect.  At the end of the Term hereof, at Landlord's option by written notice to Tenant at least thirty (30) days prior to the date on which the Lease term ends, Tenant must either  (a) remove any alterations, additions and improvements made by Tenant to the Premises either as part of Tenant's Work or otherwise, as well as Tenant's Signs, and promptly repair any damage to the Premises caused by such removal, and restore the Premises (and the walls upon which Tenant's Signs were placed) to good condition; provided that at Landlord's request  tenant shall (b) leave in place any alterations, additions and improvements made by Tenant to the Premises either as part of

Ver 1.04 01/17/12                                   - 18 -

D:\PrintImageBundler\Temp\802042\Originals\LEASE AGREEMENT.PDF

Tenant's Work or otherwise (in which case Landlord will be responsible for any future removal of such items). In addition, Tenant shall have the right at the end of the Term hereof to remove any furniture, equipment, trade fixtures or other personal property placed in the Premises by Tenant, provided that in such event Tenant must promptly repair any damage to the Premises caused by such removal, and restore the Premises to good condition. Tenant shall surrender the Premises to Landlord at the end of the Term of this Lease, without notice of any kind, and Tenant waives all right to any such notice as may be provided under laws now or hereafter in effect. In the event Tenant vacates the Premises prior to the end of the Term of this Lease, Tenant hereby grants Landlord the right to enter the Premises and to clean, repair and improve the Premises in so that the Premises are clean and in good order and repair for a future tenant (including the making of any improvements to the Premises which Landlord may desire to make), and it is expressly agreed that in such event (i) Landlord shall not be deemed to have accepted Tenant's surrender of the Premises prior to the end of the Term of this Lease, (ii) there shall be no abatement of Tenant's obligations hereunder (including without limitation the obligation of Tenant to pay rent and other charges due hereunder for the full Term of this Lease), and (iii) Tenant shall be responsible to reimburse all costs and expenses reasonably incurred by Landlord in performing cleaning, restoration and repair work which is Tenant's responsibility pursuant to this Lease, including (without limitation) the first sentence of this Article 17. Tenant shall surrender the Premises to Landlord at the end of the Term of this Lease, without notice of any kind, time being of the essence, and Tenant waives all right to any such notice as may be provided under laws now or hereafter in effect.

*Ec*

Hartford_006292

## Article 18     INDEMNIFICATION AND LIABILITY

Tenant shall indemnify, hold harmless and defend Landlord from and against any and all costs, expenses (including attorney fees), liabilities, losses, damages, suits, actions, fines, penalties, claims or demands of any kind and asserted by or on behalf of any person or governmental authority, arising out of or in any way connected with, and Landlord shall not be liable to Tenant on account of (a) Tenant's use of the Premises; (b) the conduct of Tenant's business or anything else done or permitted by Tenant to be done in or about the Premises, including (but not limited to) any contamination of the Premises or any other property or injury to persons resulting from the presence or use of Hazardous Materials caused or permitted by Tenant; (c) any breach or default in the performance of Tenant's obligations under this Lease; (d) any misrepresentation or breach of warranty by Tenant under this Lease; or (e) other acts, failures to act, or occurrences on the Premises, except to the extent caused by Landlord's gross negligence or willful misconduct or by acts or omissions of other Project Tenants or their employees, agents, licensees or invitees in connection with use of the Common Area Access. Tenant shall defend Landlord against any such cost, claim or liability at Tenant's expense with counsel reasonably acceptable to Landlord. As a material part of the consideration to Landlord, Tenant assumes all risk of damage to personal property or injury to persons in or about the Premises arising from any cause, and Tenant hereby waives all claims in respect thereof against Landlord, except to the extent caused by Landlord's gross negligence or willful misconduct. Tenant shall look to the insurance carried by Tenant (not to Landlord or Landlord's insurance carrier) pursuant to this Lease and otherwise for the recovery of any loss or damages sustained by Tenant.

## Article 19     FIRE OR OTHER CASUALTY

19.1     <u>Landlord's Election</u>.  If the Premises or the Building are damaged by fire or-other casualty in such a manner as to render the Premises partially or totally untenantable, Tenant shall notify Landlord in writing of such damage ("Tenant's Notice") as soon as practicable thereafter. Upon receipt of such notice from Tenant, Landlord shall either:

(a)     Commence repair of such damage within thirty (30) days of Tenant's Notice and pursue such repairs diligently to completion within one hundred twenty (120) days after receipt of Tenant's Notice, in which event this Lease shall continue in full force and effect except that rent shall be abated until such repairs are completed, proportionately to the portion of the Premises which is untenantable; or

(b)     Terminate this Lease, if as a result of the casualty more than 50% of the Premises is untenantable.

Landlord shall notify Tenant in writing within thirty (30) days from the date of Tenant's Notice whether Landlord elects to repair the damage as set forth in (a) above, or terminate the Lease. Failure of Landlord to give notice of its election hereunder within said thirty (30) day period shall constitute an election by Landlord to repair in accordance with (a) above.  Nothing in this



Hartford_006293

Article 19 shall be deemed to require Landlord to repair or replace Tenant's personal property or leasehold improvements, the repair or replacement of which shall be the responsibility of Tenant.

 19.2 <u>Termination by Tenant</u>.  Notwithstanding the foregoing, if the damage is of such nature or extent that, by any reasonable measure, the repair and restoration would not be substantially completed and the Premises fully available for Tenant's use and occupancy within one hundred eighty (180) days from the date of Tenant's Notice to Landlord of the damage; Tenant shall have the right to terminate this Lease by written notice to Landlord given on or before the earlier of (i) 30 days following the date of the damage, or (ii) two (2) days following commencement by Landlord of repairs to the Premises.

Article 20 FIRE INSURANCE

 20.1 <u>Real Property Insurance</u>.  Landlord maintains policies of insurance ("Property Insurance") covering loss of or damage to the Property in the full amount of its replacement value.  Such policy or policies provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other perils which Landlord deems appropriate including, without limitation, flood and earthquake insurance.  Landlord may, at Landlord's option, self-insure against any risks of loss or damage to the Property in place of all or any portion of the Property Insurance.

 20.2 <u>Payment of Estimated Premiums</u>.  Tenant shall pay to Landlord as Additional Rent each month, together with Tenant's payment of Basic Rent, one twelfth of Tenant's Pro Rata Share of the cost of providing the insurance described in Section 20.1 and in Section 23.2 (collectively, "Project Insurance Costs").  In the event that Landlord self insures any Property Insurance (pursuant to Section 20.1) or any of Landlord's Liability Insurance (pursuant to Section 23.2), Project Insurance Costs shall include an amount equal to the market premium that would be charged by an insurance company for providing such coverage as is so self insured.  Within 15 days following the rendering by Landlord of the statement described in Section 20.3 below, Tenant shall pay to Landlord any amount shown in such statement by which Tenant's estimated Project Insurance Costs for the period covered by the statement were less than the actual Project Insurance Costs due from Tenant during such period.  If Landlord's statement sets forth a revised estimated monthly Project Insurance Cost figure, then such revised figure shall be thereafter used by Tenant in payment of monthly estimated Project Insurance Costs until such figure is further revised by Landlord on a subsequent statement.

 20.3 <u>Reconciliation</u>. Each year Landlord shall furnish the Tenant with a written statement showing the computation of Project Insurance Costs due from Tenant under this Article 20.  To the extent the total of Tenant's payments of estimated Project Insurance Costs due from Tenant for the period covered by Landlord's statement is different from the actual amount shown on Landlord's statement, Tenant shall pay any deficit pursuant to Section 20.2, or shall be credited with any overpayment against future estimated Project Insurance Costs due from Tenant.  If the Term of this Lease expires prior to the determination and payment by Tenant

Ver 1.04 01/17/12   - 21 -



Hartford_006294

of Additional Rent with respect to Project Insurance Costs, Tenant's obligation to pay any Additional Rent with respect to Project Insurance Costs due under this Article 20 for any portion of the Term of this Lease for which the same has not been paid or has been underpaid by Tenant shall survive the termination of this Lease even though determination of such Additional Rent cannot be made until after such termination.   To the extent Project Insurance Costs are attributable in part to a period falling before the Term of this Lease begins or after the Term ends, the same shall be pro-rated on a daily basis to the Term of this Lease.

    20.4   Personal Property Insurance.  Tenant shall obtain and maintain, from a reputable insurance company of the type described in Article 24 below, a policy or policies of fire and casualty insurance covering the full replacement cost of Tenant's personal property and leasehold improvements.   Tenant shall provide Landlord with a certificate evidencing compliance with this Section 20.4.

Article 21      WAIVER OF SUBROGATION

    Landlord and Tenant on behalf of themselves, their respective insurers and all parties claiming under them hereby mutually release and discharge each other from all claims and liabilities to the extent that the releasing party is covered by insurance or self-insures for such loss.  Nothing contained herein is to be construed to release Tenant from its obligations to Landlord pursuant to Article 18 above.

Article 22      LOSS OR DAMAGE TO PERSONAL PROPERTY

    All personal property of Tenant or others located in or about the Project or Premises shall be there at the sole risk of Tenant, and Landlord shall not be liable for, and is hereby released from, any damage done to or loss of such personal property, it being the intent of the parties that Tenant and the owners thereof shall maintain and rely on full insurance coverage for recovery of any loss to such personal property.

Article 23      LIABILITY INSURANCE

    23.1   Tenant's Liability Insurance.  Tenant covenants and agrees that at all times within the Term of this Lease and for so long as it occupies the Premises or any portion thereof, Tenant shall, at Tenant's sole cost and expense, carry and maintain, with a reputable insurance company with a Best's Insurance Guide's rating of A XII or better, a policy of commercial general liability insurance (known as broad form comprehensive general liability insurance) insuring Tenant and Landlord against any and all liability for personal injury and property damage (including loss of use of property) arising out of the operation, maintenance, use or occupancy of the Premises, as well as all private and public sidewalks, driveways, parking areas and other grounds serving the Premises or otherwise related thereto.  Landlord shall also be a named insured on such policy and the holder of any mortgage or deed of trust on the Project shall be an additional insured on such policy.  The limits of such insurance shall be not less than $2,000,000 for each occurrence.

Ver 1.04 01/17/12                      - 22 -

Hartford_006295

The liability insurance obtained by Tenant under this Section 23.1 shall (i) be primary and non-contributing (meaning that Landlord may look solely to the insurance provided hereunder with respect to a covered claim and shall not be required to make a claim under any other insurance Landlord may have); (ii) contain a cross-liability provision or endorsement (meaning that the insurance policy will not exclude suits of Landlord against another insured under the same policy); (iii) be an "occurrence" rather than a "claims made" policy; (iv) insure Landlord against any failure of Tenant's performance under Article 18; and (v) contain a severability provision or endorsement. The term severability, as used herein means that when the term "the insured" or similar language is used in exclusions or other policy provisions, it applies only to the insured in question and not the other insureds. By way of example, and not limitation, if the policy excludes claims of an employee against an insured the exclusion only applies to the insured who is the employer and not to other insureds. The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease. Tenant shall deliver to Landlord a certificate of insurance evidencing same and shall deliver, from time and time, upon request, a true and correct duplicate original of the policy of insurance with all endorsements and evidence that such policy is in full force and effect. Such policy shall also contain a clause providing that the insurance carrier shall give to Landlord and Landlord's Lender (if any) at least thirty (30) days prior written notice of the expiration, reduction, termination or cancellation of such policy.

23.2    Landlord's Liability Insurance.    From time to time, Landlord may maintain commercial general liability insurance with respect to the Project with companies and on terms and limits reasonably acceptable to landlord ("Landlord's Liability Insurance"). Landlord may, at Landlord's option, self-insure Landlord's risk in whole or in part (such as by self-insured retention or otherwise) with respect to losses which would normally be covered by a commercial general liability policy.

Article 24    CONDEMNATION

If the entire Premises, or so much thereof as to render the remaining portion unsuitable (in Tenant's reasonable judgment) for Tenant's business as conducted in the Premises, shall be condemned or taken under the power of eminent domain, this Lease shall terminate as of the date possession thereof is taken by the condemning authority. In the event of a partial condemnation or taking of the Premises which does not render the remaining portion thereof unsuitable for Tenant's business, or in the event that a portion of the Project is condemned or taken without any actual taking of any portion of the Premises, Landlord may elect either (i) if the condemnation includes either a portion of the Project or so much of the land as to in Landlord's reasonable judgment render it not economically feasible to restore, to terminate this Lease upon and by giving written notice of such termination to Tenant within thirty (30) days after the act of condemnation, or (ii) to repair and restore the portion of the Premises and/or the portion of the Project not condemned in which event the rent shall be reduced proportionately to the portion of the Premises condemned. In any event, any condemnation award, or purchase price in lieu thereof, for the taking of all or any portion of the Premises or the Project shall be the property of Landlord, whether such award or purchase price shall be made as compensation for diminution

Hartford_006296

in value of the leasehold or for the taking of the fee, and Tenant hereby assigns to Landlord all its right, title and interest in and to any such award or purchase price. Nothing contained herein, however, shall be deemed to preclude Tenant from obtaining, or to give Landlord any interest in, any award to Tenant for moving expenses or for loss or damage to Tenant's fixtures, equipment or other property or for damages for cessation or interruption of Tenant's business.

## Article 25    SUBORDINATION

Tenant accepts this Lease subject and subordinate to any and all mortgages (including, without limitation, the notes or other obligations secured thereby and any and all renewals, modifications, consolidations, replacements or extensions of any such mortgages or the notes or other obligations secured thereby) now in existence or hereinafter made from time to time, affecting the fee title to the Project (or any part thereof) or Landlord's interest therein. Tenant also accepts this Lease subject and subordinate to all instruments in the chain of fee title to the Project, including any and all renewals, modifications, consolidations, replacements or extensions of such instruments. Tenant shall execute, acknowledge and deliver to the holder of any such mortgage or to Landlord or to any of the parties to such instruments, at any time within twenty (20) days from the date of any written request therefor by such holder or by Landlord or by any such party, any releases, certificates or other documents that may be required by such holder or by Landlord or by any such party, for the purpose of evidencing the subordination of this Lease to such mortgages or instruments or to any renewals, modifications, consolidations, replacements or extensions thereof.

## Article 26    ESTOPPEL CERTIFICATES

Tenant shall, at any time and from time to time, within fifteen (15) calendar days following written request from Landlord, execute, acknowledge, and deliver to Landlord a written statement certifying that this Lease is in full force and effect and unmodified (or, if modified, stating the nature of such modification), certifying the date to which the rent reserved hereunder has been paid, and certifying that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed. Any such statement may be relied upon by any prospective purchaser or mortgagee of all or any part of the Project. Tenant's failure to deliver such statement within said fifteen (15) -day period shall be conclusive upon Tenant that this Lease is in full force and effect and unmodified, that there are no uncured defaults in Landlord's performance hereunder, and that not more than one month's rent has been paid in advance.

## Article 27    DEFAULT

27.1    Events of Default. The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

Ver 1.04 01/17/12                                - 24 -

Hartford_006297

(a)    A failure by Tenant to pay the monthly Basic Rent or Additional Rent as reserved herein.

(b)    A failure by Tenant to make any other payment required to be made by Tenant hereunder, where such failure continues for ten (10) days after written notice thereof from Landlord to Tenant;

(c)    A failure by Tenant to observe and perform any other provisions or covenants of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such thirty day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecutes the same to completion;

(d)    The making by Tenant of any assignment for the benefit of creditors; the adjudication that Tenant is bankrupt or insolvent; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within 60 days after the filing thereof); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease (unless possession is restored to Tenant within 30 days after such appointment); or the attachment, execution or levy against, or other judicial seizure of, substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease (unless the same is discharged within 30 days after issuance thereof).

27.2    Time for Performance.   Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by Landlord hereunder unless and until it has failed to perform such obligation within thirty (30) days after written notice thereof from Tenant to Landlord; provided, however, that if the nature of Landlord's obligation is such that more than thirty days are required for its performance, then Landlord shall not be deemed to be in default if it shall commence such performance within such thirty day period and thereafter diligently prosecutes the same to completion.

Article 28    CONFIDENTIALITY

Tenant hereby expressly acknowledges and agrees that the confidentiality of the financial terms of this Lease are important to Landlord, that the promise of confidentiality by Tenant contained in this Article 28 is a material obligation of Tenant under this Lease, and that except to the extent reasonably necessary to enforce the provisions of this Lease in a court of law, (a) Tenant shall not reveal the financial terms of this Lease to any person or entity, (b) Tenant shall instruct any attorney, employee, consultant, advisor or other person who obtains knowledge of any of such financial terms that such terms must be maintained in the strictest confidence, (c) Tenant shall use its best efforts to take such steps as may be necessary to maintain the confidentiality of the financial terms of this Lease.

Ver 1.04 01/17/12                                    - 25 -

Hartford_006298

Article 29    REMEDIES

29.1    Landlord's Remedies.  In the event of any material default or breach of this Lease by Tenant as set forth in Section 27.1 above, Landlord, at its option, may terminate this Lease upon and by giving written notice of termination to Tenant, or Landlord, without terminating this Lease, may at any time after such material default or breach, without notice or demand additional to that which may be provided in Article 27 hereof, and without limiting Landlord in the exercise of any other right or remedy which Landlord may have by reason of such default or breach (other than the aforesaid right of termination), exercise any one or more of the remedies hereinafter provided in this Article or as otherwise provided at law or in equity, all of such remedies (whether provided herein or at law or in equity) being cumulative and not exclusive:

29.2    Termination.  In the event Landlord terminates this Lease, Landlord may recover possession of the Premises and remove all persons and property therefrom, and Landlord shall be entitled to recover as damages all of the following:

A.    The worth at the time of award of the unpaid rent and the unpaid other sums payable by Tenant hereunder which had been earned at the time of termination;

B.    The worth at the time of award of the amount by which the unpaid rent and the unpaid other sums payable by Tenant hereunder which would have been earned after termination until the time of award exceeds the amount of such loss of rent and such other sums that Tenant proves could have been reasonably avoided;

C.    The worth at the time of award of the amount by which the unpaid rent and unpaid other sums payable by Tenant hereunder for the balance of the Lease Term after the time of award exceeds the amount of such loss of rent and such other sums for such period that Tenant proves could be reasonably avoided; and

D.    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom.

The "worth at the time of award" of the amounts referred to above in paragraphs A and B of this Section 29.2 is computed by allowing interest at the rate of ten percent (10%) or at the legal rate of interest at the time of award, whichever is greater.  The "worth at the time of award" of the amount referred to above in paragraph C of this Section 29.2 is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of

Ver 1.04 01/17/12                        - 26 -



Hartford_006299

award plus one percent (1%). Efforts by Landlord to mitigate the damages caused by Tenant's breach of this Lease do not waive Landlord's right to recover damages under this Article.

29.3  <u>Reletting by Landlord</u>. Landlord may relet the Premises prior to the time of award for breach of this Lease by Tenant. In such case Landlord shall be entitled to recover from Tenant all of the sums which Landlord is entitled to recover from Tenant under Section 29.2, it being expressly agreed that the award to Landlord when Landlord has so relet the Premises shall also consist of the worth at the time of award (as defined in Section 29.2) of the amount by which the unpaid rent and the unpaid other sums payable by Tenant hereunder for the balance of the Lease Term after the time of award exceeds the amount of such loss of rent and such other sums that Tenant proves could be reasonably avoided.

29.4  <u>Landlord's Remedies When Lease Not Terminated</u>. Should Landlord not terminate this Lease, Tenant's right to possession shall be maintained, in which event this Lease shall continue in effect whether or not Tenant shall have vacated or abandoned the Leased Premises. In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover rent and such other sums as the same become due hereunder. Landlord shall not be deemed to have terminated this Lease or Tenant's liability hereunder by any act of Landlord, including without limitation, any repossession, re-entry or reletting, unless Landlord expressly notifies Tenant in writing that Landlord elects to terminate this Lease; nor shall any legal action taken by Landlord against Tenant by and of itself terminate this Lease or Tenant's liability hereunder (regardless of any causes of action or prayers for relief therein contained) unless judgment is entered therein terminating this Lease.

29.5  <u>Landlord's Right to Cure Defaults</u>. Landlord shall have the right, but shall not be obligated, to cure any default or any portion thereof for the account and at the expense of Tenant, either concurrently with or at any time before or after the exercise of any other remedy granted herein or by law, in which event all costs and expenses paid or incurred by Landlord in connection with the curing of such default shall be immediately due and payable by Tenant to Landlord. Landlord shall have the right at any time subsequent to any such curing, to exercise any right or remedy herein granted to Landlord which may have arisen by reason for the default so cured.

29.6  <u>Tenant's Personal Property</u>. In the event of any entry or repossession under this Article 29, Landlord may enter the Premises (in conformance with applicable laws) without thereby incurring any liability to Tenant, and take possession of the Premises and all personal property of every kind on the Premises, and apply against the accelerated rent and the expenses, including attorneys' fees, which Landlord may have incurred in connection with such repossession, either the value of such personal property or the proceeds, after selling expenses, from the sale of such personal property, whichever Landlord chooses to do. In the alternative, Landlord may give written notice to Tenant to remove from the Premises all personal property owned by Tenant, and if Tenant fails to remove such property within fifteen (15) days after such notice, then Tenant shall be deemed to have abandoned all such property and Landlord may use, sell or otherwise dispose of all such property in such manner as Landlord deems advisable.

Ver 1.04 01/17/12                           - 27 -

Article 30    WAIVER

The failure or delay on the part of either party to enforce or exercise at any time any of the provisions, rights or remedies in this Lease shall in no way be construed to be a waiver thereof, nor in any way to affect the validity of this Lease or any part hereof, or the right of the party to thereafter enforce each and every such provision, right or remedy. No waiver of any breach of this Lease shall be held to be a waiver of any other or subsequent breach. The receipt by Landlord of rent at a time when the rent is in default under this Lease shall not be construed as a waiver of such default. The receipt by Landlord of a lesser amount than the rent due shall not be construed to be other than a payment on account of the rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction, and Landlord may accept such payment or check without prejudice to Landlord's right to recover the balance of the rent due or to pursue any other remedies provided in this Lease. No act or thing done by Landlord or Landlord's agents or employees during the Term of this Lease shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord.

Article 31    QUIET ENJOYMENT

If and for so long as Tenant pays the rent reserved hereunder and observes and performs all of the covenants, conditions and provisions on Tenant's part to be observed and performed hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy and Premises for the entire Term hereof. Landlord warrants and represents to Tenant that Landlord is the owner of good title or leasehold title to the Project, and that Landlord has full and complete power and authority to enter into this Lease.

Article 32    COMMUNICATION EQUIPMENT AND BILLBOARD/SIGNAGE RIGHTS

Landlord retains the right to use or lease to others sites for locating antennas and other communications equipment on the rooftop of the Building and on poles located on other areas of the Project, provided that the same does not interfere with Tenant's use of the Premises or Tenant's Signs. In the event, Landlord installs a billboard or other signage at the Project, Landlord will not allow Tenant's trade competition (other furniture retailers) to advertise at the Project and such other signage shall not interfere with Tenant's Signs.

Article 33    SUCCESSORS

The respective rights and obligations provided in this Lease shall bind and inure to the benefit of the parties hereto, their legal representatives, heirs, successors and assigns; provided, however, that no rights shall inure to the benefit of any successor of Tenant unless Tenant has complied with the requirements of Article 14.

Ver 1.04 01/17/12                       - 28 -

Hartford_006301

Article 34    UNAVOIDABLE DELAY & LATE PAYMENTS

34.1    Unavoidable Delay.    Subject to the provisions of Section 2.1, in the event that either party shall be delayed or hindered in, or prevented from, the performance of any work, service or other acts required under this Lease to be performed by the party and such delay or hindrance is due to strikes, lockouts, acts of God, governmental restrictions, enemy act, civil commotion, unavoidable fire or other casualty, or other causes of a like nature beyond the control of the party so delayed or hindered, then performance of such work, service or other act shall be excused for the period of such delay and the period of the performance of such work, service or other act shall be extended for a period equivalent to the period of such delay. The provisions of this Article shall not operate to excuse Tenant from the prompt payment of rent and other monetary payments required hereunder.

34.2    Additional Rent-Late Payment.    Tenant understands and agrees that Landlord will incur a substantial hardship if payments required of Tenant hereunder are not timely made. Therefore, it is agreed by Tenant that in addition to all other remedies of Landlord in this Lease and pursuant to law, in the event any payment required by this Lease to be made to Landlord by Tenant is not received by Landlord on or before five (5) calendar days after the due date thereof as set forth in this Lease, Tenant shall pay to Landlord as additional rent (in addition to all other rent required to be paid under this Lease) an amount equal to two (2%) percent of the amount of the delinquency for each calendar month or fractional part thereof during which such delinquency continues.

Article 35    NOTICES

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been properly given if sent by registered or by certified mail, postage prepaid, by commercial overnight delivery service or by facsimile transmission (with an original sent by U.S. Mail) or if sent by telegraph, charges prepaid, addressed to Tenant at the address for Tenant set forth in Section 1.1 of this Lease, or addressed to Landlord at Landlord's address set forth in Section 1.1 of this Lease. Either party may at any time and from time to time by written notice to the other party, specify a different address for notice purposes than that set forth above or in Section 1.1.

Article 36    GOVERNING LAW

This Lease shall be construed, governed and enforced in accordance with the laws of the State in which the Premises are located.

Ver 1.04 01/17/12                - 29 -

*Ec*

Hartford_006302

Article 37    SEVERABILITY

If any provision of this Lease or any part thereof shall be held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of such provision and the remaining provisions hereof shall in no way be affected or impaired and this Lease and all parts thereof not expressly affected by such holding shall remain in full force and effect.


Article 38    CAPTIONS

Article and Section captions, titles of exhibits and riders and any table of contents to this Lease, are for convenience and reference only, and are in no way to be construed as defining, limiting or modifying the scope or intent of the various provisions of this Lease.


Article 39    GENDER AND NUMBER

As used in this Lease, the word "person" shall mean and include, where appropriate, an individual, corporation, partnership or other entity; the plural shall be substituted for the singular, and the singular for the plural, where appropriate; any words of any gender shall mean and include any other gender.


Article 40    EXECUTION

This Lease shall become effective when it has been signed by a duly authorized officer or official of each of the parties. This Lease may be executed in counterparts. Each counterpart, when taken together, shall be deemed to be one integrated agreement and each of such fully executed counterparts shall be deemed an original and it shall not be necessary in making proof of this Lease to produce or account for more than one such counterpart.


Article 41    EXHIBITS

Exhibits attached to this Lease and referred to herein are incorporated herein by reference.


Article 42    BROKERS

Tenant represents and warrants to Landlord that Tenant has had no dealings with any broker, finder, or similar person who is or might be entitled to a commission or other fee in connection with introducing Tenant to the Property or in connection with this Lease, except for Tenant's Broker, if any, and Landlord's Broker listed in Section 1.1 above. Tenant shall indemnify and hold Landlord harmless from and against (i) any misrepresentation of the

Ver 1.04 01/17/12                              - 30 -

Hartford_006303

foregoing facts; (ii) any and all claims of any person who claims to have represented Tenant in connection with this Lease; and (iii) all losses, costs, damages, expenses, claims, liabilities, and judgments, including without limitations, reasonable attorneys' fees and costs, arising out of or in connection with such claims. Landlord shall indemnify Tenant against (i) any claims by Landlord's Broker, if any, (as set forth in Section 1.1) or any other broker claiming to have represented Landlord in connection with this Lease, and (ii) all losses, costs, damages, expenses, claims, liabilities, and judgments, including without limitations, reasonable attorneys' fees and costs, arising out of or in connection with such claim. Landlord will pay Tenant's Broker a commission in the amount of $120,317.00 as follows: Within 10 days following the receipt by Landlord of Tenant's Security Deposit and Tenant's Basic and Additional Rent for the first month of the term of this Lease, Landlord shall pay Tenant's Broker $80,212.00. The remaining commission of $40,105.00 will be paid by Landlord to Tenant's Broker within 10 days following the receipt by Landlord of the fourth (4th) full month of Basic and Additional Rent payable by Tenant under this Lease, provided that Tenant is not then in default of its obligations under this Lease beyond any applicable notice and cure periods.

## Article 43    LANDLORD

As used in this Lease, the term "Landlord" means only the owner or owners of the fee title to the Premises or the leasehold estate under a ground lease of the Premises at the time in question. Each landlord is obligated to perform the obligations of Landlord under this Lease only during the time such Landlord owns such interest or title. Any Landlord who transfers its title or interest is relieved of all liability with respect to the obligations of Landlord under this Lease to be performed on or after the date of transfer. However, each Landlord shall deliver to its transferee all funds that Tenant previously paid if such funds have not yet been applied under the terms of this Lease. Tenant shall give written notice of any failure by Landlord to perform any of its obligations under this Lease to Landlord and to any ground lessor, mortgagee or beneficiary under any deed of trust encumbering the Premises whose name and address have been furnished to Tenant in writing. Landlord shall not be in default under this Lease unless Landlord (or such ground lessor, mortgagee or beneficiary) fails to cure such non-performance within thirty (30) days after receipt of Tenant's notice. However, if such non-performance reasonably requires more than thirty (30) days to cure, Landlord shall not be in default if such cure is commenced within such thirty (30) day period and thereafter diligently pursued to completion. The liability of Landlord for the performance of its duties and obligations under this Lease is limited to Landlord's interest in the property of which the Premises are a part, and neither the Landlord nor its affiliates, partners, shareholders, officers or other principals shall have any personal liability under this Lease.

## Article 44    MISCELLANEOUS

44.1    <u>No Recordation</u>.  Tenant shall not record this Lease without prior written consent from Landlord, which may be granted or withheld at Landlord's sole discretion.

Ver 1.04 01/17/12                              - 31 -

Hartford_006304

44.2    Crime.  Crime is prevalent in urban areas and Oakland is no exception.  Tenant agrees that although Landlord may from time to time implement or increase or decrease measures intended to deter crime, Landlord is in no way making any representation to Tenant regarding the safety and security of the Project and is in no way guarantying the safety or security of Tenant's personnel or property and Tenant shall not seek to recover against Landlord in the event of an occurrence of third party criminal acts, in which event Tenant shall look solely to Tenant's insurance thereon. Tenant shall be solely responsible to provide for the security and safety of Tenant's employees and invitees.

44.3    Corporate Authority; Partnership Authority.  If Tenant is a corporation, each person signing this Lease on behalf of Tenant represents and warrants that he has full authority to do so and that this Lease binds the corporation.  If Tenant is a partnership, each person or entity signing this Lease for Tenant represents and warrants that he or it is a general partner of the partnership, that he or it has full authority to sign for the partnership and that this Lease binds the partnership and all general partners of the partnership.

44.4    Relocation.  In the event that Landlord requires the Premises in connection with new or expanding tenants Landlord may, upon thirty days prior written notice, relocate Tenant to another location in the Project of the same square footage and with comparable facilities and with similar lay-out and configuration  (i.e. size and lay-out and number of docks and grade level entrances).  Landlord shall minimize the inconvenience to Tenant, moving tenant after hours or on a weekend if Tenant desires.  Landlord shall pay all costs of such relocation, including moving Tenant's inventory, signs and any overtime labor of Tenant's employees in connection with such relocation.

44.5    Attorneys' Fees.  In any dispute between the parties resulting in litigation, arbitration or other dispute resolution proceeding, the prevailing party shall be entitled to recover its attorneys' fees and costs incurred in connection with such dispute both before and in the course of such proceedings, from the other party.

44.6    Joint and Several Liability.  All parties signing this Lease as Tenant shall be jointly and severally liable for all obligations of Tenant.

44.7    Entire Agreement.  This Lease, including the exhibits and any riders hereto, contains all the agreements, conditions, understandings, representations and warranties made between the parties hereto with respect to the subject matter hereof, and may not be modified orally or in any manner other than by an agreement in writing signed by both parties hereto or their respective successors in interest.

44.8    Binding Agreement.  Landlord's submission of this Lease to Tenant shall not constitute an offer to Tenant and this Lease shall not be a binding agreement unless and until it has been signed by both Landlord and Tenant.

44.9    Administration of Tenant's Vehicles:  Tenant shall administer the parking of Tenant's vehicles (including, but not limited to, employee vehicles, contactor vehicles, visitors,

Ver 1.04 01/17/12                          - 32 -

trucks, trailers and containers) ("Tenant's Vehicles") to ensure that the Tenant's Vehicles do not interfere with the traffic flow into and out of the property and to ensure that Tenant's Vehicles only park in the areas designated in the Lease.

44.10  <u>Traffic and Parking Regulations</u>.  Tenant hereby acknowledges and agrees that Landlord reserves the right to make such rules and regulations as in Landlord's judgment may, from time to time, be needed for proper traffic flow, safety, care and cleanliness of the Project and for the preservation of good order therein.  Such rules and regulations shall not affect Tenant's rights hereunder to the exclusive use of Tenant's Docks as set forth in Section 1.1 of this Lease.  Tenant may use one or more of Tenant's Docks for parking of vehicles other than trucks or trailers provided that doing so will not result in congestion of trucks which are waiting for a loading dock to become available.  In the event, Tenant does not follow the parking regulations set forth herein, as the same may hereafter be reasonably modified from time to time by Landlord, Landlord reserves the right to, at Tenant's cost, hire personnel to direct traffic to ensure that the other tenants at the property are not inconvenienced by Tenant's Vehicles.

IN WITNESS WHEREOF, the parties hereto have duly executed this Lease as of the day and year first above written.

CARSON MADRONA COMPANY, LLC
a California limited liability company

By: _____
      James L. Krasne, Vice President

Date: _____

WAREHOUSE AND DELIVERY
SOLUTIONS, INC.

By: _____

Print Name: _ED CORN JR_____

Its: _PRESIDENT_____

Date: _1/18/12_____

Hartford_006306

Hartford_006307



JOINT INDEX 00158

Hartford_006308



PROJECT SITE PLAN

(LEASED PREMISES SHOWN HATCHED)

EXHIBIT-B (12-29 2011)

JOINT INDEX 00159
Hartford_006309



EXHIBIT-C (12/29/2011)

TENANT'S DOCKS

Page 174

D:\PrintImageBundler\Temp\802042\Originals\LEASE AGREEMENT.PDF

# EXHIBIT D

Landlord shall perform the following improvements at Landlord's sole cost and expense all of which shall be commenced promptly after lease execution.

Interior Improvements:

1. Remove existing walls in office areas in Unit A and Unit D, resulting in the configuration shown in Exhibits A, B and C.
2. Replace floor covering (if any presently exists) in areas where existing walls were removed.
3. Touch up paint as needed.
4. Repair ceiling where walls are removed.
5. Remove electrical power poles in open area of office.
6. Re-key all exterior doors

Exterior Improvements – 6195 Coliseum Way:

1. Landlord will construct the Three New Docks and the Five New Docks shown and identified on Exhibit B as New Docks 1A through 8A, inclusive, located in the Truck Plaza on the south side of the 6195 Building).
2. The new docks shall be equipped with edge of dock levelers.
3. Canopies will be installed where needed to cover the New Docks.

Exterior Improvements – 6201 Coliseum Way:

1. Landlord will reconfigure the existing docks serving the 6201 Coliseum Way building to eliminate existing docks 1 through 4, and construct New Dock 2, New Dock 3 and New Dock 4 as shown on Exhibit B.

Ver 1.04 01/17/12                                 - 37 -

*EC*

Hartford_006310